```
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF TEXAS
 2                        ABILENE DIVISION

 3   UNITED STATES OF AMERICA,     )
              Government,          )
 4                                 )
     VS.                           )   CAUSE NO. 1:23-CR-028-H
 5                                 )
     JASON KYLE KERBY,             )
 6            Defendant.           )

 7

 8       ----------------------------------------------------

 9                      SENTENCING HEARING
           BEFORE THE HONORABLE JAMES WESLEY HENDRIX,
10               UNITED STATES DISTRICT JUDGE

11                      JUNE 10, 2024
                       ABILENE, TEXAS
12
         ----------------------------------------------------
13
                     A P P E A R A N C E S
14
     FOR THE GOVERNMENT:
15   UNITED STATES ATTORNEY'S OFFICE
     1205 TEXAS AVENUE, SUITE 700
16   LUBBOCK, TEXAS 79401
     BY:  CALLIE WOOLAM
17

18   FOR THE DEFENDANT:
     WOLF, STALLINGS & MAYO
19   ATTORNEYS AT LAW
     310 W WALL, SUITE 900
20   MIDLAND, TEXAS 79701
     BY:  TYLER MAYO
21

22

23   FEDERAL OFFICIAL COURT REPORTER: MECHELLE DANIEL, 1205 TEXAS
     AVENUE, LUBBOCK, TEXAS 79401, (806) 744-7667.
24
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY; TRANSCRIPT
25   PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.
```

1                              <u>INDEX</u>

2

3    DEFENDANT'S SENTENCING EVIDENCE/ARGUMENT................    9

4    DEFENDANT'S EXHIBIT NO. 1 ADMITTED (SEALED).............   12

5    ALLOCUTION.............................................   13

6    GOVERNMENT'S EXHIBITS A THROUGH E ADMITTED (SEALED).....   17

7    GOVERNMENT'S SENTENCING EVIDENCE/ARGUMENT..............   17

8    SENTENCING FACTORS.....................................   49

9    SENTENCE BY THE COURT..................................   58

10   RIGHT TO APPEAL........................................   70

11   REPORTER'S CERTIFICATE.................................   72

12

13

14

15

16

17                          *  *  *  *  *

18

19

20

21

22

23

24

25

```
 1                  P R O C E E D I N G S
 2              THE COURT:  The Court calls the last case on the
 3    sentencing docket today, United States vs. Jason Kyle Kerby,
 4    Case 1:23-CR-028-1.
 5              Who is here on behalf of the defendant?
 6              MR. MAYO:  Tyler Mayo, Your Honor, on behalf of
 7    Mr. Kerby.
 8              THE COURT:  Thank you, Mr. Mayo.
 9              And for the United States?
10              MS. WOOLAM:  Good afternoon, Your Honor.  Callie
11    Woolam on behalf of the United States.  Ready to proceed.
12              THE COURT:  Thank you, Ms. Woolam.
13              Mr. Kerby, good afternoon.
14              THE DEFENDANT:  Good afternoon.
15              THE COURT:  Would you please tell me your full
16    name, sir.
17              THE DEFENDANT:  Jason Kyle Kerby.
18              THE COURT:  All right.  Mr. Kerby, let's talk about
19    your case and how we got here today.
20              You previously appeared before Magistrate Judge
21    Parker back in late January.  You pled guilty to Counts 5 and 6
22    of the superseding indictment charging you with two counts of
23    production of child pornography.
24              Judge Parker found that your guilty plea was
25    knowing and voluntary and supported by a sufficient factual
```

1    basis, so he recommended that I accept your guilty plea.  And I

2    did.  On February 12th, I entered an order that accepted your

3    guilty plea and adjudged you guilty of the crime alleged

4    against you.

5         Now, Mr. Kerby, I know this is the first time you

6    and I are actually seeing each other during this process, but I

7    want you to know I'm very familiar with your case.  Obviously,

8    there have been a lot of filings in this case.  The Court, with

9    the great assistance of its court staff and law clerks, have

10   reviewed all these materials, and I am prepared to proceed

11   today.  Okay?

12        THE DEFENDANT:  Yes, sir.

13        THE COURT:  All right.  Mr. Mayo, have you had an

14   opportunity to read the presentence report, the PSR addendum,

15   and the PSR second addendum and discuss those documents with

16   your client?

17        MR. MAYO:  Yes, Your Honor.

18        THE COURT:  Mr. Kerby, have you had an opportunity

19   to read your presentence report, the PSR addendum, and the PSR

20   second addendum and discuss those documents with your attorney?

21        THE DEFENDANT:  Yes, Your Honor.

22        THE COURT:  You understand we're here so I can

23   decide what sentence to impose?

24        THE DEFENDANT:  Yes, sir.

25        THE COURT:  Okay.  All right.  Mr. Mayo, do you

```
1    have any objections to the PSR, the PSR addendum, or the PSR

2    second addendum?

3              MR. MAYO:  No, Your Honor.  And I'd also highlight

4    what Ms. Woolam filed regarding restitution.  The defense is in

5    agreement that the $540,000 amount is correct, as noted in the

6    conditions of supervised release.  517,000, roughly, was noted

7    in the second addendum, but we are not objecting to the 540,000

8    amount.

9              THE COURT:  Okay.  And that--you're referencing the

10   government's amended statement adopting the second addendum?

11             MR. MAYO:  That is correct, Judge.  And I filed an

12   amended--or an answer adopting that.  That second addendum had

13   the incorrect amount, so I just wanted to make that clear on

14   the record.

15             THE COURT:  Okay.  All right.  And the correct

16   amount--  You're saying the amended statement regarding the

17   second addendum had an incorrect amount?

18             MR. MAYO:  I believe it referenced 517,000, Judge.

19   It didn't account for the travel expenses and the rental home

20   for the alleged victim--or, excuse me, not the alleged.  Excuse

21   me.  The victim and her family and the family members.

22             THE COURT:  Okay.  All right.  Well, we will get to

23   the amounts to make sure we're all on the same page when we get

24   to that portion of the sentencing.  But thank you for noting

25   that you have no objections and that you--other than making
```

```
 1    sure the amount is precisely correct--
 2              MR. MAYO:  Yes, Your Honor.
 3              THE COURT:  --you have no objections.
 4              MR. MAYO:  No objections.
 5              THE COURT:  Any objections from the United States
 6    to the PSR, its addendum, or its second addendum?
 7              MS. WOOLAM:  No, Your Honor, with the exception of
 8    that restitution issue, which is well documented in the
 9    filings, and we can discuss that when we get to restitution.
10              THE COURT:  Okay.  All right.  Thank you.
11              The Court, hearing no objections, adopts the PSR,
12    the PSR addendum and second addendum's factual findings and
13    legal conclusions as my own, except, as the parties recognize
14    today, the Court notes that the victim impact and restitution
15    amount should also include an additional $22,346.34 in
16    restitution awarded to Does 1 and 2 jointly.  This amount
17    corresponds to the Does' travel and housing expenses following
18    the FBI raid that are detailed in Docket Number 44-1 and
19    previously agreed to by the parties in Docket Numbers 47 and
20    48.  This additional restitution was also included in the
21    Court's notice of intent to impose conditions of supervised
22    release.  So I will include that $22,346.54.
23              That's the amount I have.  Is that what you have,
24    Mr. Mayo?
25              MR. MAYO:  Yes, Your Honor.
```

```
 1              THE COURT:  Ms. Woolam, is that correct?
 2              MS. WOOLAM:  That's correct.  I might have misheard
 3    you, Your Honor.  I thought maybe the first time, you said
 4    34 cents, but it is 54 cents, and you said that correctly just
 5    now.
 6              THE COURT:  Yeah, 54 cents.  So I have $22,346.54.
 7              MS. WOOLAM:  That's correct, Your Honor.
 8              THE COURT:  All right.  Mr. Mayo?
 9              MR. MAYO:  That is correct.
10              THE COURT:  Okay.  Thank you both.  So with that
11    slight caveat, otherwise, I do adopt the PSR and its addendum
12    and second addendum.
13              I want to thank both parties for working together
14    about the restitution amount.  The Court already doesn't like
15    to do math.  It especially doesn't like to do math in public in
16    front of a room full of people.  No one wants to hear that
17    anyway.  So I asked the parties to get together.  I'd also like
18    to thank Probation.  This a complex case.  This is a difficult
19    case.  You all worked together very professionally while still
20    advocating for your clients, and that has made the Court's job
21    a lot easier, and we were able to get to the right result
22    outside of court.  So I do appreciate and I commend both sides
23    for doing that.
24              Okay.  Mr. Kerby, let me tell you your statutory
25    sentencing range and your advisory guideline range.  So the
```

```
 1    statutory sentencing range, or the total possible range of
 2    punishment here, sir, is a term of imprisonment--  And this is
 3    for each count of conviction.  For each count of conviction,
 4    the range potentially is a term of imprisonment of at least
 5    15 years, but not more than 30 years; a fine of $250,000, or
 6    both; and a period of supervised release of at least 5 years,
 7    and up to life.
 8              Now, under the guidelines manual, we have a total
 9    offense level of 43; your criminal history category is I; and
10    that results, typically, in an advisory guideline range of life
11    imprisonment.  Now, one, that's advisory on me.  Two, that's
12    not your actual guideline range here, because the statutory
13    maximum that you could face is 30 years per count.  And because
14    of that, the guideline--the advisory guideline range becomes
15    360 months per count, combined, for an advisory range of
16    720 months.
17              Mr. Mayo, have I stated that advisory guideline
18    range correctly?
19              MR. MAYO:  Yes, Your Honor.
20              THE COURT:  Ms. Woolam?
21              MS. WOOLAM:  That is correct, Your Honor.
22              THE COURT:  All right.  Okay.  Mr. Mayo, I am in
23    receipt of your sentencing memorandum that requests a sentence
24    of 360 months per count, to run them concurrently, for a total
25    sentence of 30 years.  You note multiple things in that, and I
```

```
 1    understand that memo, but I'd be glad to hear any additional
 2    evidence or argument that you have today on behalf of your
 3    client.
 4              MR. MAYO:  Sure.
 5              THE COURT:  And why don't you use the podium for
 6    the court reporter's benefit.
 7              Mr. Kerby, you may have a seat.
 8              MR. MAYO:  Judge, I appreciate that.  I also filed
 9    the case law that I cited, both the Randall case and--
10              THE COURT:  Yeah, this is going to be--this one is
11    tricky, so let me just spell it for my court reporter.
12              MR. MAYO:  Sure.
13              THE COURT:  I think I know which one you're going
14    to mention.  G-r-z-y-w-i-n-s-k-i.  Is that the one you were
15    going to reference?
16              MR. MAYO:  Yes, Your Honor.
17              THE COURT:  Let's just call it Grzywinski.
18              MR. MAYO:  That's perfect.
19              THE COURT:  Good enough for me.  Okay.
20              MR. MAYO:  And to make it even easier, I'll mostly
21    reference Randall, Judge.
22              THE COURT:  All right.
23              MR. MAYO:  Those cases--both defendants in those
24    received 45 years in prison, with multiple counts of production
25    of child pornography, among other heinous acts.  Those--both of
```

```
 1    those defendants were also prior sex offenders before receiving
 2    the new federal charges.
 3              Let me back up and say I have great empathy and
 4    sorrow for the victims in this case, Judge.  Nothing that I
 5    say, the government says, or the sentence imposed today can
 6    bring them back to square one.  I have two daughters of my own.
 7    I would note that I have great empathy for that family, and I
 8    know Mr. Kerby does as well.  It might come--  I hope the Court
 9    doesn't find that disingenuous, but I do believe he does have
10    remorse for his actions in this case.
11              I'll also note that the Smith case that the
12    government cites in their sentencing memorandum--while he was a
13    one-point offender, he also had a prior uncalculated sexual
14    exploitation of a minor.  So not any of the cases are really
15    analogous to this case.
16              I'm not asking for a downward variance.  I'm not
17    asking for anything other than to run these two counts
18    concurrently, Judge.  Thirty years is a sufficient sentence to
19    both promote accountability to the public, to hold the
20    defendant responsible, and to protect the public from future
21    crimes.
22              Mr. Kerby is a zero-point offender.  He's--  You
23    know, I could stand up here and make excuses, Judge.  I'm not.
24    This was heinous behavior; outside of his character, as shown
25    by his complete lack of criminal history, his loving family
```

```
 1    that I've had contact with throughout.  His son was married

 2    yesterday--his youngest son, Mason.

 3              And so, you know, he's not going to have any

 4    free-world communication with his parents again.  That was

 5    because of his actions.  He's not going to have any

 6    communication in the free world with his children while they're

 7    still children because of his actions, Judge.

 8              That being said, 30 years is a sufficient period of

 9    time to hold him accountable for these heinous acts, Judge, and

10    I would ask that you run these concurrently.

11              THE COURT:  Okay.

12              MR. MAYO:  Thank you.

13              THE COURT:  All right.  Thank you, Mr. Mayo.  I

14    appreciate that argument today.  I appreciate your written

15    sentencing memorandum, Docket Number 54.  I've considered

16    everything in that as well.  The Court has read and considered

17    Randall and Grzywinski.  I'll ask my colleague in Amarillo,

18    Kacsmaryk, how to properly pronounce that.  He will know.

19              But I've considered both of those cases.  I've read

20    them closely and considered your argument that, in light of

21    them, to avoid unwarranted sentencing disparity, the Court

22    should impose two 30-year sentences running concurrently.

23              I've also considered support letters from--on

24    behalf of Mr. Kerby from his sons.  That's Document

25    Number 54-1.  I have considered those.  Would you like to offer
```

1   those into evidence, Mr. Mayo, given that the Court has

2   considered them, or no?

3             MR. MAYO:  I would, Judge.  I also served them to

4   Ms. Woolam, as well as U.S. Probation, prior to this hearing.

5             THE COURT:  Okay.  All right.  Any objection to

6   admitting them into evidence?

7             MS. WOOLAM:  No, Your Honor.  They are part of a

8   sealed document.  I don't know that the Court intends to seal

9   them or not, but the government has no objection either way.

10            THE COURT:  Would you like to ask that they be

11  sealed, or no?

12            MR. MAYO:  I would ask that they remain sealed just

13  with the sentencing memorandum, Judge.

14            THE COURT:  Okay.  All right.  In light of their

15  relation to sealed sentencing materials, the Court will admit

16  them as Defendant's 1--Defendant's Sentencing 1.  They will be

17  filed under seal.  I find that the defendant's need for privacy

18  and the safety of the family outweighs the public's right to

19  access.  They are just general support letters from sons on

20  behalf of the father, with some of the unique circumstances

21  mentioned in this case.

22            Okay.  Mr. Kerby, I've heard from your attorney.  I

23  have read all the materials in this case.  But you have the

24  right to speak today if you'd like.  You do not have to say

25  anything if you don't want to, and I won't hold it against you

```
 1    if you don't.
 2              Is there anything you would like to say, sir?
 3              THE DEFENDANT:  Yes, Your Honor.
 4              THE COURT:  Okay.  Go ahead.
 5              THE DEFENDANT:  First and foremost, I want to
 6    apologize to my stepdaughters.  I can't put into words the
 7    regret that I have for the situation I've put them in.  It's
 8    the first thing I think about every morning.  It's the last
 9    thing I think about every night.  I betrayed their trust, and I
10    know nothing that I say can--or do can change the past, but I
11    would give anything to stop the sequence of events that brought
12    us here today.
13              I was--I started living as a hypocrite against
14    everything I believe, everything I've taught my kids, and I'm
15    thankful that the dark path I was on was exposed.  There are
16    several members of my family here today and several others in
17    the courtroom who are all extremely disappointed in me.  Some
18    would even say they hate me.  But there's no one more
19    disappointed or ashamed of my mistakes than myself.  I have let
20    down and hurt everyone in this world that I care about most.  I
21    let down my parents and my in-laws as a son.  I let down my
22    siblings as a brother.  I let down my wife as a husband, and I
23    let down my kids as a father and a stepfather.
24              Like Mr. Mayo said, one of my kids got married
25    yesterday.  It's one of a thousand milestones every parent
```

 1    dreams of sharing with their kids that I won't be able to share

 2    with them, that I won't be able to support them.  And no matter

 3    how many good things I've done in my life, this is what people

 4    are going to remember about me.

 5            I just pray for this Court's mercy so that I can

 6    one day have the opportunity to redeem myself to my family and

 7    society and show everyone that there's been a transformation in

 8    me.

 9            Thank you, Your Honor.

10            THE COURT:  All right.  Thank you, Mr. Kerby.  I

11    appreciate that statement, and I will take that into account.

12            All right.  Mr. Mayo, why don't you and your client

13    have a seat.

14            MR. MAYO:  Judge, briefly, I can't remember if we

15    addressed competency or anything like that, Judge.  Mr. Kerby

16    is competent.  I will note for the record, since being in Eden,

17    he has been on psychoactive medication for both anxiety and

18    depression.  My communication with Mr. Kerby has improved

19    throughout this--throughout this span of time over ten months

20    now.  I just wanted to note that for the Court's record and

21    that that is not a factor in his competency or anything like

22    that.

23            THE COURT:  Okay.  All right.  There's no dispute

24    that he has been competent throughout these proceedings?

25            MR. MAYO:  No, Your Honor, not at all.

```
 1              THE COURT:  Ms. Woolam, you agree with that.
 2    Right?
 3              MS. WOOLAM:  The United States doesn't have any
 4    reason to believe he is anything other than fully competent.
 5              THE COURT:  Nor do I.  Okay.
 6              MR. MAYO:  Thank you, Judge.
 7              THE COURT:  And there's no evidence otherwise.  All
 8    right.  Thank you for that.
 9              All right.  Okay.  Ms. Woolam, I'd be glad to hear
10    anything from the United States.  I would ask, if possible, if
11    we could begin with admitting any evidence that you think we
12    should admit today.
13              MS. WOOLAM:  Yes, Your Honor.
14              Your Honor--
15              THE COURT:  I was considering the information
16    attached to your memorandum, which are mostly documents about
17    restitution--that's 53-1--as well as the victim impact
18    statements in 53-2.
19              MS. WOOLAM:  Yes, Your Honor.  If I may actually
20    begin with moving the Court to dismiss the remaining counts of
21    the superseding indictment and proceeding to sentencing on
22    Counts 5 and 6.
23              THE COURT:  That's granted.
24              MS. WOOLAM:  I will forget that if I don't do
25    that--
```

```
 1                    THE COURT:  So will I.

 2                    MS. WOOLAM:  --very first.

 3                    THE COURT:  Okay.

 4                    MS. WOOLAM:  Thank you, Your Honor.

 5                    Your Honor, attached to various sealed sentencing

 6      exhibits, we have Exhibits A, B, C, D, and E.

 7                    Exhibit A was provided to defense counsel and to

 8      the Court to review.  It is the restitution packet for an

 9      unrelated victim that we ask the Court to take into

10      consideration as an example of the types of issues, especially

11      with regard to mental health, that Does 1 and 2 will face.

12      That's the April packet for the Aprilblonde series.

13                    And we would ask, for each of these, that they be

14      admitted under seal, given the nature of their references to

15      victims and their use as sealed sentencing exhibits.

16                    Exhibit B is the full restitution documents

17      submitted by--on behalf of Does 1 and 2, who are referred in

18      various things as L.C. and R.C.

19                    There were some documents submitted previously.

20      Counsel for the defendant and I had a phone conference, which

21      was very helpful in resolving the restitution issues, with L.C.

22      and R.C.'s biological father and stepmother, and they, as a

23      result, provided some additional documentation.  Through the

24      conversations and with all the documentation submitted, we have

25      agreed to the restitution numbers, and those final numbers--I
```

1    know we'll get to restitution, but they are spelled out in the

2    notice of supervised release conditions correctly.

3              Exhibit C are three victim impact statements.  That

4    was attached to Docket Number 53.

5              Exhibit D includes two additional victim impact

6    statements.  That was attached to Docket Number 58.

7              And Exhibit E is the final victim impact statement

8    we submitted on behalf of L.C. and R.C., and that was attached

9    to Docket Number 61.

10             THE COURT:  All right.  Mr. Mayo, any objection to

11   admitting Government's A through E, and admitting them under

12   seal?

13             MR. MAYO:  No objection, Judge.

14             THE COURT:  Government's A through E are admitted.

15   They are admitted under seal.  I do make a specific finding

16   that the victims' right to privacy is outweighed by the

17   public's right to access those court documents.  So for all

18   those reasons, they are admitted, and they are admitted under

19   seal.  I'll ask both sides to keep up with the originals of

20   your exhibits.

21             All right.  You may proceed, Ms. Woolam.

22             MS. WOOLAM:  Thank you, Your Honor.

23             Your Honor, there's no secret here that the

24   United States is asking for a sentence of 720 months, the

25   maximum for both counts, to run consecutively, for a total

1    maximum sentence of 60 years.  The United States believes that

2    the defendant should spend the next 60 years of his life waking

3    up every single day thinking about his abuse of his two

4    stepdaughters.

5           I don't think I ever can say things quite the same

6    way that individuals are able to say them in the victim impact

7    statements we receive, and there were several received in this

8    case which have just been admitted.  I would like to just read

9    a few portions of some of the things that the family members

10   and community have had to process with Mr. Kerby's abuse of not

11   just his stepdaughters, but several other individuals.

12           A letter from Jay Weaver states, among other

13   things:

14           "The entire mess has been infuriating,

15        disgusting, sickening, and completely immoral.

16        This has been a crippling blow to our family, and

17        we would all love to see his sentencing carried out

18        to the fullest extent of the law.

19           "Jason deserves no mercy for the crimes he has

20        committed.  Too many people were involved and

21        deceived by this monster of a human.  The fact that

22        children were involved and drugged for his pleasure

23        is unfathomable."

24           Laurie Sherrod writes, in part, discussing the

25   trust that her whole family had on Jason Kerby:

1    "Little did we know he was a devil

2    masquerading as a Christian.  Jason professed to be

3    a Christian musician, and we were all super happy

4    that they had found each other, all the while not

5    imagining the evil creature that lay behind this

6    Christian facade.

7        "This travesty has resulted in the loss of

8    innocence for five children.  Three young men have

9    had their idea of a father-figure shattered, and

10   two beautiful young girls will likely be unable to

11   trust male figures in the future.  Luckily, Daysha

12   had a solid relationship with her church family.

13   They rallied and got her moved into a safe home.

14       "All the people involved in Jason's depravity

15   have had to face the consequences of his actions.

16   He needs to be held accountable for the destruction

17   he has caused.  There is no prison sentence long

18   enough to extinguish the pain and suffering he has

19   caused in the lives of the people subjected to the

20   wickedness they have had to endure.  These children

21   may lose all their ability to discern right and

22   wrong.  It could lead to suicide and/or violence in

23   the future.

24       "Please consider all victims and the

25   long-lasting effects of Jason's tragically

 1          premeditated, horrific acts."

 2              Mary Higby writes, in part, referring to the girls,

 3     as well as Daysha:

 4              "Let's talk about their mental health.  Daysha

 5          and her daughters' mental health are now in

 6          jeopardy.  All three of them are in therapy.  All

 7          three are trying to figure out how to navigate this

 8          new life, this new life where they can't trust

 9          people, where they are stared at, questioned.

10          People whisper whenever"--"wherever they go.

11          Thankfully, people will eventually find something

12          new to discuss, but it won't change the emotional

13          scars the girls and Daysha will have a lifetime

14          trying to heal.  No amount of therapy can overcome

15          something like this.

16              "So I plead with you to please give him the

17          maximum prison sentence for the safety of women,

18          men, and children.  Please do not allow him parole.

19          Please give Daysha, her girls, me, and this

20          community the comfort of getting one more sick

21          pedophile behind bars, one more monster who

22          deserves to be locked up, away from society."

23              Kenny and Janessa Berry write about their own

24     daughter's suffering at Jason's hands:

25              "He was somebody she completely trusted, as

```
 1          did our entire family.  As you can imagine, the
 2          emotional impact from having someone you trust
 3          commit this kind of betrayal is unimaginable.
 4          Jason never exhibited any warning signs or, quote,
 5          red flags that would have caused someone to have
 6          any suspicion of him.  This scenario would make
 7          anyone unable to have confidence in their own
 8          ability to discern someone's true character."
 9                Referring to their daughter, "had just moved
10          into her first college house when this was
11          discovered, and, of course, it has created a sense
12          of fear and mistrust.  For example, she has had the
13          opportunity to spend this summer in Montana as a
14          church intern, for which she was provided a host
15          home.  You can only imagine the fear and
16          apprehension she feels as she must constantly try
17          to identify if there is a reason to be concerned
18          with the host family or if there are any unknown
19          cameras in the home.  An amazing experience has now
20          been tainted with the consistent fear that comes
21          from being a victim of something such as this.
22                "As her parents, there is tremendous
23          heartbreak in hearing your daughter with true fear
24          in her voice as she tries to navigate the aftermath
25          Jason has created with his actions.  She is strong
```

1    and has worked very hard over the past nine months

2    to find ways to begin healing from this incident.

3    Although this will impact her for the rest of her

4    life, she will continue to work through ways to

5    restore her trust in relationships around her.

6    While her trust of earthly people may be shaken,

7    she places her ultimate trust in the Lord.

8        "Even though Jason has not expressed any

9    remorse, she would want you to know that she

10   ultimately forgives Jason, as the Lord asks her to

11   do.  However, forgiveness does not mean an absence

12   of boundaries.  Jason's selfish actions and

13   addiction to money, sex, and attention have

14   impacted so many people in very lasting ways.

15       "It is our belief that Jason is unable to

16   comprehend the trail of destruction that his

17   actions have created and that his prideful

18   personality could create repetition of his

19   behavior.  We feel that he should receive the

20   maximum sentence, to limit any possible ways that

21   he could hurt other potential victims."

22       Your Honor, the last two letters, I would like to

23   read in their entirety.  It is the letter submitted by Daysha,

24   who I mentioned.  That is--the victims named in Counts 5 and 6,

25   that is their biological mother, as well as the letter

1    submitted by their biological father and stepmother on their
2    behalf.
3            When I discussed the opportunities to speak at
4    sentencing with many individuals involved, I explain how it can
5    be stressful coming up here and speaking your words about
6    especially about the horrific nature of abuse that somebody
7    like Jason Kerby has caused to these individuals.  And I think
8    every one of these individuals that was strong enough to write
9    letters appropriately chose not to speak in person.  They
10   didn't need additional stress in their lives, to have to come
11   up here and face Jason directly.  But I hope that Mr. Kerby
12   will hear the words that they have written and taken the time
13   to put together and think about them every day for the rest of
14   his life.
15           Daysha Weaver writes:
16           "When I consider where to start writing a
17       victim impact statement, I realize that it would
18       have been much easier to say how we have not been
19       impacted, which would have been nothing.  This has
20       impacted every part of our lives.  It has been
21       extremely hard and emotionally painful to think
22       about.
23           "Seven years ago, I moved my girls and me to
24       Abilene to start a new life with a man and his
25       boys. I wholeheartedly believed this man to be a

```
1    good Christian, a man who promised to love and
2    protect myself and my girls.  He even wrote and
3    recorded songs about it, as well as wrote and
4    recorded Christian songs.  We built what I believed
5    to be at the time a beautiful life together.  Jason
6    had it all: a beautiful home with an amazing yard,
7    a great job where he was continually successful, a
8    successful and growing side business, a church and
9    life group where we were active, and, most
10   importantly, a beautiful family with kids and a
11   wife who adored, trusted, and loved him.  I am not
12   like Jason in the fact that he is overly confident
13   and conceited, which was always my pet peeve of
14   him, but I can say with confidence that I was the
15   best wife I could have been to him, loyal and
16   loving, and the best stepmom to his boys that I
17   knew how to be.  The girls were good sisters to his
18   boys and good stepdaughters to him.
19        "At 6:00 a.m. on August 28th, the FBI
20   surrounded our house and beat on all the windows
21   and doors, yelling, 'FBI, let us in,' and our lives
22   were forever changed.  That was the last time I've
23   seen Jason.  There was no time even to ask what was
24   going on before we all met at the front door, him
25   and I, his youngest son, and my two daughters, and
```

he was immediately arrested and taken away.  We
were all in shock and will forever have trauma over
the abrupt awakening that morning.  We were all
taken to stand in front of a yard while FBI agents
entered our house and started going through
everything.  I could see them get ladders and start
with air conditioner/heating vents and electrical
outlets.  Even then, it never occurred to me that
the reason they were there could be as bad as it
was.  I thought maybe he was a bookie or had gotten
into trouble with illegally selling equipment.

"After about 15 minutes, I was asked to sit
in an FBI car with two agents.  We live across the
street from the high school, so my life was turned
upside down as the Wylie High School cross-country
team ran by.  As they showed me the first picture,
all my love for my husband turned to hate.  With
each picture, the hate grew.  I discovered that the
man I married was not a good Christian man.  I
found out I had been married to an amazing actor, a
pathological liar, and a monster.  I never
considered myself capable of hate.  I taught my
girls it was wrong.  But this has all made me into
a different person, one that feels tremendous hate
towards him now.  Sometimes it is all-consuming.

1    "Upon seeing the pictures, I realized my

2  children and I could never stay in that home again,

3  the home we loved and had worked hard on.  That

4  day, we packed bags and have never stayed there

5  another night.  I also immediately hired an

6  attorney to file for divorce.

7    "I soon discovered that cameras, including

8  bathrooms and bedrooms, had been hidden all over

9  the house.  We literally never had privacy in our

10  own homes.  I found out that Jason had been

11  videoing and taking pictures of me and sharing them

12  on the internet without my permission for years,

13  including very intimate moments.  I learned from

14  news articles that they had been shared with

15  Christian wife voyeur sites.  I found out from

16  meetings with the FBI that he had been videoing at

17  our house for years: our families, my mother, his

18  mother, his sister-in-law, his niece, our friends

19  and their children, our children's friends, and his

20  boys' girlfriends.  He completely took advantage of

21  the fact that I wanted to be the"--"that I wanted

22  to be the place where my girls' friends hung out.

23  I wanted to be involved with them and to know where

24  they were and who they were hanging out with.

25  Parents entrusted us with their minor children and

1    felt safe letting them come over.  The girls'
2    friends are no longer allowed to stay at other
3    people's homes.  Many of them are in therapy, and
4    many travel with portable devices that are supposed
5    to pick up cameras and recorders and have to check
6    spaces to ease anxiety, as do we.  Not only did he
7    video and share at our home; I found out that he
8    took cameras disguised as chargers on family
9    holidays and vacations where he had taken the boys'
10    girlfriends.  This was all very much premeditated.

11        "In these meetings and the coming months, I
12    also found out that Jason had been cheating on me.
13    Not just a few people, but with countless numbers.
14    Many included neighbors; customers in our business;
15    another individual and his son"--"that his son and
16    he had gone to for years; people he sang with,
17    including with Christian music songs; and countless
18    numbers I don't even know about.  These people had
19    also been videoed.  When I asked the FBI if there
20    was anything else, they were able to tell me"--
21    "they told that they also had videos of him with
22    17 different men.  This came as an even bigger
23    shock, since he had always been against it, said it
24    was against the Bible and made lots of jokes about
25    it, especially back and forth to his work friends.

1    After finding out all the new information, I had a
2    panic attack and had to go get tested for sexually
3    transmitted diseases.  Every day, I have to walk
4    around my community wondering, who else.  I hate to
5    admit that it has been heartbreaking, as I thought
6    he was in love with me and never wondered about him
7    being faithful.  He was very, very good at
8    pretending.
9        "I spent those first few weeks in a haze of
10    meetings with the FBI, getting a lawyer and meeting
11    with the lawyer, meetings with CPS, meetings with
12    the Children's Advocacy Center, meetings with the
13    Regional Victims Crisis Center, trying to get
14    things out of the house I had loved and find a new,
15    safe place for my girls and me to live.  I missed
16    weeks of school, using up days I had accumulated
17    over my 12 years of teaching.  My girls missed
18    several days in the beginning, as well.  When I
19    went back to work, I still had to get myself to
20    therapy sessions, appointments, court, and
21    meetings, and the girls to their therapy and
22    appointments, as well, when it was my time with
23    them.  Therapy will have to continue for years,
24    maybe a lifetime.
25        "I have wanted to be a mother since I was

```
 1          little.  I picked a career as a teacher to have the
 2          same schedule as my kids.  I worked for three years
 3          saving money to spend seven years at home with my
 4          babies so I would not miss a second.  My girls have
 5          always been my number-one priority.  When they got
 6          older, I started talking to them about predators,
 7          checking tablets and phones, and having them under
 8          my close watch.  I hovered over them and wanted
 9          them to be at our house so I could ensure their
10          safety and protect them from the monsters of the
11          world.  I never dreamed in a million years that the
12          monster, predator, the molester would be living
13          under my own roof, sleeping beside me.
14              "Because of him and the idea that I should
15          have known, I've been drug through a custody battle
16          during the most traumatizing time of my life.  I've
17          spent thousands of dollars on this, as well as on
18          protective orders for both of my daughters.
19          Despite doctors, therapists, specialists, and other
20          judges telling me that I would not have known that
21          these kinds of people are"--"that these kinds of
22          people are experts at hiding, I will always feel
23          guilty for not knowing, not seeing any signs, and
24          unknowingly putting myself and my daughters in this
25          situation.
```

```
1        "Jason grew up in a Christian home.  He was
2   raised going to church and learning the Bible.  He
3   continued attending church as an adult, even
4   working as a music minister.  We attended church
5   regularly and were active in a life group.  Our
6   children went to church camp every summer.  He
7   knows and has always known the difference between
8   right and wrong.  Every single time he did these
9   horrible things, he was making a decision.
10       "All three of us, myself and my girls, have
11  had trouble sleeping since the arrest.  Doe 1 and I
12  have had to get on medicine to help us.  Doe 1 also
13  had to get on anxiety medicine and blood pressure
14  medicine as a 14-year-old because of the stress,
15  anxiety, and panic attacks.  I have had to get on
16  additional anxiety medication.  I anticipate we may
17  have to be on medications forever.  I also
18  anticipate us all having to continue with therapy
19  to deal with the issues he has caused.
20       "This has been horrifying, humiliating, and
21  embarrassing for all three of us.  I am a very
22  private person, and Wylie is a small community, so
23  the fact that everyone knows what has happened and
24  who we are continues to be a daily struggle.
25  Everyone knows who Jane Doe 1 and Jane Doe 2 are,
```

```
 1            as listed in the articles and on the news.
 2            Everyone at our schools knows what has happened.
 3            We must courageously hold our heads up and face the
 4            looks, whispers, and pity daily.  He has taken away
 5            our trust in men, security for the future, and
 6            destroyed a family.
 7                 "What he did to everyone is horrible, but
 8            what he did to my sweet innocent little girls is
 9            unforgivable.  Two little girls who trusted him and
10            loved him.  He is a predator and should never be
11            allowed to be around young people ever again.  He
12            has already gotten away with so much with so many
13            indictments being dropped in the plea deal.  I'm
14            asking that he get the highest number of years for
15            what he did to my two precious daughters, who did
16            not deserve any of this."
17                 And lastly, Your Honor, the victim impact statement
18       submitted on behalf of Jane Does 1 and Jane Does 2:
19                 "Two of the minor victims perpetrated by Jason
20            Kerby were his stepdaughters, now the ages of
21            twelve and fifteen, with whom he has had access
22            since approximately 2016.  Neither child felt
23            comfortable writing a victim impact statement;
24            instead, chose to allow their father and stepmother
25            to write this statement on their behalf based on
```

```
1        the information they have shared and our parental
2        observations and experiences with the children.
3        The girls collaborated on the topics in this
4        statement within their level of comfort.
5            "Jason has stolen much from these children,
6        including their childhood, innocence, purity, and
7        trust.  He established and asserted dominance and
8        egotistical superiority over those much weaker and
9        purer than himself without regard to effects and
10       consequences on other human beings.  His actions to
11       merely gratify his personal deviant desires and to
12       feed his narcissism will extend throughout the
13       lives of these children.  Since the FBI raid on
14       their family home in August 2023, they have
15       acquired knowledge of his actions and learned about
16       his ongoing behaviors lacking regard for others,
17       his unwillingness and inability to experience
18       remorse, and his continued deviant behaviors.
19       Because of Jason's actions, these girls have
20       experienced the realization that they cannot trust
21       people, especially those with whom they have the
22       closest of relationships and live.  Home no longer
23       represents safety.  From Jason, they have learned
24       that those who say they love you, in reality, hurt
25       you and cannot be trusted; those who should
```

1    protect, instead, violate.

2        "Though children do not yet have the mental

3    development and emotional capacity to understand

4    abuse or articulate their experiences, these girls

5    are trying to process and organize the past, harm,

6    and new information.  These girls are still very

7    much experiencing the crisis almost one full year

8    after learning about Jason's actions.  They are

9    also engaged in trauma responses.  They do

10   understand that Jason's behaviors were wrong, and

11   they worry about their future, privacy, health, and

12   relationships.  They have confusing and conflicting

13   thoughts and feelings related to the abuse of their

14   minds, bodies, emotions, relationships, and

15   religion.

16       "Their distrust of Jason surfaced before the

17   FBI raid and peaked weeks before the raid occurred.

18   In their home, they felt unprotected, powerless,

19   and unnoticed as children in danger.  After the

20   raid, they learned of Jason's actions against them.

21   It is understandable why they are worried about

22   their images being distributed, the community

23   knowing of their"--"of the perpetration by Jason,

24   the shame to their family, and Jason's lies and

25   sickness.  They are angry and must grapple with the

1    thoughts of ill will that they have been taught is

2    morally wrong against Jason.  Their sense of safety

3    and the number of their safe relationships has

4    dwindled to a couple, because they no longer trust

5    those placed in a position to love and protect

6    them.  Since they knew something was wrong for two

7    years before the raid, they are working to manage

8    their self-trust and instincts.

9        "As we all know, one person's actions always

10    affect others, both directly and indirectly.  His

11    actions have fractured significant relationships

12    within their family of origin, required them to

13    uproot from their home, move multiple times in less

14    than one year, seek ongoing counseling, and now

15    engage in a disruptive and psychologically

16    difficult custody battle to ensure they are

17    protected and will not be harmed again.  While

18    moving out of the home where they were used and

19    perpetrated was bittersweet for the girls, they

20    continue to be required, as a matter of choice of

21    adults, to continue riding in the vehicle belonging

22    to Jason, a reminder of him and his actions.

23        "Both girls have cried and feel loneliness

24    because their friends' parents do not hold trust

25    for their children to visit them for activities,

1    much less spend the night with the girls, because
2    their children have also been violated by Jason.
3    The girls feel outcasted, tainted, and punished
4    because Jason took pictures of their friends and
5    other family members, and their family story was on
6    the news in a small community and spread rampant in
7    their schools.  Their academic year of sixth and
8    ninth grade began with an FBI raid and has
9    continued past the final day of the school year
10   with a lack of structure, stability, and security.
11   They are worried that they will not get to see
12   their friends throughout the summer because of
13   Jason's actions.  For children and adolescents,
14   friendships and school are contributors to healthy
15   development.  Instead, these girls are lonely,
16   shamed, feel a low sense of self-worth, and must
17   pay for Jason's actions mentally and relationally.
18        "When primary caregivers tell a child that she
19   is the only problem in their marriage instead of
20   embracing and offering unconditional love and
21   regard, it stays in the psyche permanently.  This
22   is something else he must live with.  In early
23   2023, L.C. began having sudden-onset headaches, and
24   this continued until December 2023, when finally
25   she was prescribed medication to manage her blood

 1    pressure that was in the critical range for a heart
 2    attack.  The high blood pressure coincided with
 3    Jason's increasing arguments with her in the home
 4    about trivial matters and the lack of protection
 5    offered her as a child by witnesses.  Since the
 6    raid occurred less than one year ago, L.C. has
 7    experienced significant weight gain, putting her at
 8    further risk for cardiac and other medical
 9    problems.  After the FBI raid and knowledge
10    provided to her about Jason's actions, she required
11    an antianxiety medication she continues to take
12    today.  For a period after the FBI raid, when in a
13    specific environment where she felt unsafe and
14    unprotected, she required a sleeping pill to afford
15    her any rest.  R.C. is angry, untrusting, and feels
16    powerless as a child with no control over her own
17    life.  She experiences flashbacks of Jason entering
18    her room at night with a light and removing
19    blankets from her body.  Difficulty sleeping and
20    nightmares have plagued both girls as their
21    security and personal boundaries have been violated
22    throughout their lifetime, beginning in their
23    formative years.  Both girls have demonstrated
24    increased struggles with energy, motivation,
25    ambition, and drive.

```
 1              "Since his incarceration, the girls have been
 2         placed in inappropriate reversed roles to help
 3         others cope with Jason's choices, acceptance of his
 4         personality disorders and authentic self, and
 5         divorce, resulting in further instability and
 6         turbulence to their lives.  Such roles have impeded
 7         the girls' needs being met and their ability to
 8         enter their own path for healing, all while
 9         required to navigate new experiences and
10         information regularly without an end in sight.
11         Both girls are angry that they were forced within
12         their primary family to pacify Jason's needs above
13         their own by having to take responsibility for his
14         feelings, apologize to him for his ongoing and
15         escalating chauvinistic and infantile arguments
16         with L.C., making R.C. kiss him on the mouth and
17         sit on his lap weeks before the FBI raid without
18         intervention at the age of eleven years, being
19         required to say 'I love you' to Jason when they did
20         not want to, and instructed to call him 'Dad' when
21         they did not see him as their dad and did not want
22         to refer to him as such.
23              "Daily the girls must question without
24         formative comprehension how Jason could continually
25         engage in such violence and abuse of two people he
```

1    purportedly loved and was positioned to protect.
2    Their minds struggle with darkness, fear, and anger
3    as they attempt to understand how the people from
4    whom they needed the most protection lived in their
5    own home and violated them for personal and
6    financial gain.  Of course, there's no possible
7    explanation or justification for such
8    maliciousness; hence, mental resolution in this
9    regard is impossible.  They trusted Jason and
10   relied on him as vulnerable children, yet he
11   intentionally and consciously failed them for his
12   own self-serving fulfillment.  They may require
13   years or a lifetime of effort, support, and therapy
14   to gain some semblance of understanding and
15   resolution to his predatory behaviors against them.
16        "Jason's actions have forced them to mature
17   early.  They have learned that trust must be earned
18   and that even those closest to them are not
19   trustworthy, honest, genuine, and protective.  Home
20   is not safe; caregivers are not protectors.  They
21   struggle with the awareness that Jason sought them
22   out from the beginning as young children to gratify
23   his personal sexually deviant needs while
24   attempting to grow a business from his violation of
25   them to become an entrepreneurial pseudo porn

1    actor, producer, and distributor, including images

2    of the girls online.  They have been required to

3    acquire knowledge of subjects that children should

4    not be introduced to, nor should they have been

5    nonconsenting actors and victims of his sick world.

6    Jason was allowed the privilege of serving in the

7    role of stepfather despite their father's

8    verbalized warnings, and he was allowed to hijack

9    and poison their lives.  Sadly, the girls are very

10    aware of these choices made for their lives,

11    especially by Jason.

12         "Of importance to the girls is the ability to

13    know and understand the implications, effects, and

14    potentialities of Jason's actions on their bodies.

15    Since learning of Jason's perpetration on them,

16    they have not been able to obtain a comprehensive

17    gynecological exam, an abuse assessment by a

18    competent and qualified medical professional, or

19    knowledge of these effects of the drugs Jason used

20    on them since he has refused to share this

21    information for their benefit.  As a matter of

22    principle, they want to know the drugs used and the

23    method of administration.  They feel a continued

24    violation because they are not privy to this

25    information and subsequently cannot know what

signs, symptoms, and outcomes may result from the
drugs now or in the future.

"Knowing their images were produced and
distributed on the internet, the girls worry about
who has seen their pictures, will see their
pictures in the future, and how this may influence
their life moving forward.  They understand that
they now will work with lawyers throughout their
lifetime to manage the effects of Jason's
pornography business of which they were
nonconsensual actors, the potential voluminous FBI
notifications, court proceedings, and more.
Understandably, they are concerned about the ease
of accessibility of their images.

"The girls also understand they may have
ongoing medical and mental health needs throughout
their lifetime.  As they enter dating as teenagers,
intimate relationships, motherhood, and watch their
children grow, they will be reminded of their
childhood experiences in the primary home and at
the will of Jason.  There is no way to predict the
exact extent or effects of Jason's actions on their
lives.  Since March 2023, one or both children have
requested and/or participated in counseling.  L.C.
is now seeing her fifth counselor since April 2023

1    and, R.C., a third counselor; efforts that have

2    been required to find a fit to help them addressing

3    the comprehensiveness of what has occurred since

4    their formative years to the present without their

5    consent, knowledge, protection, or ability to

6    communicate openly and honestly in their primary

7    home.

8        "The search for a counselor that can help them

9    to address their past trauma and ongoing crises has

10   required them to share their story repeatedly,

11   something they greatly dislike and find

12   uncomfortable and burdensome.  No child desires to

13   spend their adolescence in ongoing therapy to

14   process, understand, and hope to acquire some

15   resolution to such acts as performed by Jason.

16   Hopefully they will be able to eventually discover

17   a personal purpose and meaning in the circumstances

18   for which they had no will or power.

19       "Jason's prideful behaviors since his arrest

20   demonstrate his psychopathology.  He continues to

21   seek justification and defends his actions by

22   seeking character references, telling his sons he

23   is reading the Bible and praying, believing he can

24   be redeemed.  The girls understand that these

25   behaviors demonstrate a lack of remorse and a

1    denial of wrongdoing by Jason.

2        "Since, as a family, they were taught to sit

3    in the front row of the church with hands lifted

4    high to praise God, they are experiencing spiritual

5    and religious conflict and no longer want to attend

6    their church home"--"their home church, where their

7    personal boundaries were further violated in

8    response to the media coverage of Jason's abuse.

9    Now they feel uncomfortable, lack of faith in the

10    church, and untrusting of the church, and

11    understand the deceptiveness and maliciousness that

12    accompanies some false followers of God.  Because

13    of Jason's choices, they have lost their church

14    home, their youth group, trust in organized

15    religion and the church.  They have had to evaluate

16    their values, beliefs, truths, and confront dark

17    feelings toward other humans; namely, Jason.

18        "As well as their medical and mental health

19    and emotional stability, Jason has poisoned their

20    experience with the church and religion.  The

21    violations of these two children extend beyond the

22    physical abuse into emotional and mental abuse.

23    These girls have learned firsthand that while we

24    must not harm or take the lives of another human

25    into our own hands to seek justice, sometimes we

1    have the desire to do so, and some lives are not

2    worthy of breath or existence.  Jason has

3    introduced this harsh reality into their lives as

4    children that should have"--"that should have been

5    able to experience pure innocence, naivete, and

6    unconditional love until much later in life.

7        "As these girls continue to develop, mature,

8    and progress through life stages, they will

9    undoubtedly be reminded of Jason and his choices.

10   They will be confronted with mental, psychological,

11   emotional, spiritual, and noetic and relational

12   challenges on unknown scales.  How they will

13   respond to these challenges can range from

14   resilience and altruism into emotional instability,

15   self-harm, addiction and eating disorders,

16   homicidal and suicidal ideation, an inability to

17   have children, unhealthy relationships, difficulty

18   with intimacy, impulsivity, the inability to trust

19   and suspicious tendencies, accepting Jason's

20   actions as their responsibility in shame, guilt,

21   anger, loneliness, and isolation.

22       "They will have to manage their reality and

23   feelings of abandonment by their primary caregivers

24   at a high risk for recidivi"--excuse me--

25   "revictimization, may feel the world is unsafe and

| | |
|---|---|
| 1 | unstable, and have adjustment problems.  Their |
| 2 | academic and career development can be impaired by |
| 3 | trauma.  Each girl will be required to evaluate and |
| 4 | address their views of men, caregivers, the family |
| 5 | system, the meaning of home, and safety. |
| 6 | "In summary, Jason has affected every aspect |
| 7 | of their life, and processing, coping, discovering |
| 8 | purpose and meaning and learning how to live life |
| 9 | fully at different stages very well may require |
| 10 | their full lifetime.  Jason's selfish moments of |
| 11 | personal gratification and narcissism has changed |
| 12 | the trajectory of their lives and perspectives of |
| 13 | their past.  No human has this right or privilege |
| 14 | and should never be allowed to affect another human |
| 15 | in such a manner." |
| 16 | THE COURT:  Does that conclude the victim impact |
| 17 | statements? |
| 18 | MS. WOOLAM:  That does, yes, Your Honor. |
| 19 | THE COURT:  Okay.  Thank you for reading those. |
| 20 | Victims have a right to be heard.  They have a right under the |
| 21 | law.  There's a statute that governs this.  So they have a |
| 22 | right to have you read those, and it was their choice to have |
| 23 | you read them in lieu of their appearing today, which is |
| 24 | perfectly fine.  They have been heard, and I will take those |
| 25 | statements into account. |

1          Before we move on, are there any other victims
2    present that want to be heard today?
3          MS. WOOLAM:  No, Your Honor.
4          THE COURT:  All right.  Go ahead.
5          MS. WOOLAM:  Thank you, Your Honor.
6          Your Honor, a 720-month sentence for Mr. Kerby is
7    the only appropriate sentence in this case.  The nature and
8    circumstances of this offense are absolutely deplorable.  A
9    720-month sentence, the statutory maximum, will provide a just
10   punishment, reflect the seriousness of this offense, and
11   hopefully protect society, and especially children.
12         For years, Mr. Kerby masqueraded as a good
13   Christian leader of his community, all while hiding horrific
14   crimes that he was committing.  Kerby sexually abused
15   14-year-old Doe 1 multiple times.  He drugged her, is our
16   belief, although, as noted, he has not admitted specifically to
17   what drugging, but based on factors located in the Kerby home
18   and on chat messages, it is believed he gave Doe 1 Ambien to
19   knock her out and keep her asleep so that he could sneak into
20   her room at night and sexually abuse her.
21         THE COURT:  Yeah, that was my understanding, and
22   the PSR reports that he would give her Ambien so she wouldn't
23   wake up during the abuse.  And there was no objection to that
24   in the presentence report; is that right?
25         MS. WOOLAM:  That's correct, Your Honor.

```
 1                 THE COURT:  Okay.  Go ahead.

 2                 MS. WOOLAM:  Yes, Your Honor.  Specifically,

 3      messages that were located amongst Kerby's devices, where he

 4      was engaging in conversations with what I will refer to only as

 5      a pedophile community, Kerby was instructing others how to use

 6      Ambien to sexually abuse individuals, including minors.

 7                 Kerby told people online, "Sweet.  You can order

 8      Ambien online; two is phenomenal," is one statement that he

 9      made, referring to the use of Ambien.

10                 He also told an individual online, "Wish we could

11      drug both our daughters up and keep taking turns fucking their

12      brains out."

13                 Kerby told another individual online, "Give her

14      three Ambien and fuck her brains out."

15                 Tragically--I don't know how any facts could be

16      more tragic, but the fact that Doe 1 was drugged during this

17      abuse gave her no opportunity to even ever come forward and

18      make an outcry that this abuse was happening, because every

19      time he would film himself sexually abusing Doe 1, she was

20      drugged.  She was out cold.  And that's what made it easy for

21      him.

22                 He then distributed those videos to others online.

23      It was mentioned in the victim impact statements, but there is

24      no telling--  The only person sitting in this courtroom that

25      has any idea how many people have probably seen the sexual
```

1   abuse of these girls is Jason Kerby, because he knows how many

2   people he sent those videos to.  These girls will spend a

3   lifetime learning about more people that are located with their

4   videos.

5          In addition to the sexual abuse of Doe 1 while she

6   was knocked out, he filmed Doe 2, who was eleven years old at

7   the time; created sexually explicit films of her that she

8   didn't know were taking place while she was in the bathroom.

9          He also had hidden cameras throughout his entire

10   house filming any single person he could capture.  There are at

11   least three other victims that have been identified throughout

12   this investigation that would be minors that Kerby captured

13   sexually explicit videos of just trying to have an overnight

14   stay at his house, trying to enjoy their childhoods.

15          And he distributed those videos.  And we know of

16   the distribution because, at this point, one other individual

17   has been caught with those videos, an individual in Wisconsin,

18   which fortunately is the only reason that we are here today.

19   If that individual in Wisconsin hadn't saved the videos of

20   Kerby sexually abusing and sexually exploiting these victims,

21   Kerby may have never been captured.  He may have continued this

22   for years.

23          Kerby's crimes are unspeakable.  They are the stuff

24   of nightmares.  They are things that no adult should even have

25   to think about, let alone the children that have had to unpack

 1    this and learn about what they didn't know was happening to
 2    them.   A 720-month sentence will hopefully guarantee that Jason
 3    Kerby is never able to walk out of a prison cell.   It will
 4    hopefully protect children from him.   It will keep him from
 5    being able to engage in this pedophile community to fuel
 6    others' sexual desires, and it will reflect how truly heinous
 7    and horrific his actions were.
 8              For all of these reasons and all of the 3553(a)
 9    factors, the United States requests a sentence of the statutory
10    maximum, 720 months, which would be a 360-month sentence as to
11    each of Counts 5 and 6, to run consecutively to one another.
12              Thank you, Your Honor.
13              THE COURT:  All right.  Thank you, Ms. Woolam.  I
14    appreciate that argument, and I will take all that into
15    account.
16              And if--  One of the victims mentioned a desire to
17    not grant parole.  If the victims were physically present--
18    you've probably explained this to them in any event, but if
19    they were physically present, I would explain to them, there's
20    no such thing as parole in the federal system.  Parole was
21    abolished in the federal system long ago.  So to the extent you
22    have not explained that already, I would ask the victim witness
23    coordinator, who I know is in the courtroom--again, it's most
24    likely already been done anyway, but out of an abundance of
25    caution, I would tell them that.

```
 1              All right.  Ms. Woolam, do you know any reason why
 2    the Court cannot lawfully impose sentence at this time?
 3              MS. WOOLAM:  No, Your Honor.
 4              THE COURT:  Mr. Mayo?
 5              MR. MAYO:  No, Your Honor.
 6              THE COURT:  All right.  I have carefully reviewed
 7    the presentence report, the PSR addendum and its second
 8    addendum, and I inform the defendant that the plea agreement is
 9    finally accepted.  Judgment and sentence will be consistent
10    with it.
11              I am required by statute to impose a sentence that
12    is sufficient, but not greater than necessary, to comply with
13    the purposes of sentencing set forth in Section 3553(a)(2), and
14    to consider all of the sentencing factors listed in that
15    statute, which I have done.
16              Now, Mr. Kerby, all that really means, what I just
17    said, is that I consider certain guideposts in every case to
18    try to figure out what's a reasonable sentence.  Every case is
19    different because every person is different, every crime is
20    different, and every criminal defendant's history is
21    different.
22              One of the guideposts that I apply in every case is
23    the nature and circumstances of the offense, or what was the
24    crime, what did you do.  It is difficult to overstate the
25    appalling, egregious, unthinkable nature of your crime, its
```

1    relevant conduct and its scope.  We've talked at length about

2    it.  I have adopted the presentence report, so I don't need to

3    restate everything, because, of course, I know what happened

4    here.  Let me see if there's anything else that hasn't

5    previously been mentioned that I want to mention.

6            Regarding your activity in online communities

7    involving this activity, that is an aggravating factor to me

8    here.  I mean, there are many, but we haven't talked about that

9    in too much length.  But you asked to speak with agents after

10   the agents seized your devices and you told them that you used

11   messaging platforms to communicate with others about having sex

12   with their wives and that you had hidden cameras throughout

13   your residence, including the bathroom.  And you admitted that

14   you were part of a social media messaging group called Verified

15   Daughter that shared child sexual abuse images.

16           You admitted that you took images of Doe 1 with

17   hidden cameras placed in vents, electrical outlets, and a USB

18   charger, and that you had recorded her and others for several

19   years.  After being confronted with a series of pictures of the

20   actual sexual abuse of Doe 1, you admitted that it was you who

21   were in those images and videos and that you sexually abused

22   Doe 1.

23           Doe 1 would wake up about twice a month to a cell

24   phone light and you standing next to her in her bed.  She said

25   that when she was not tired before bed, you would pressure her

51

1  into taking sleep medications and that you would take photos of

2  her and her friends when they were at the pool.

3          A forensic examination of your devices revealed

4  that you were sexually abusing Doe while she was sleeping, and

5  videos were also recovered depicting Doe 2 while--well,

6  pictures of her that were sexual in nature.

7          An external hard drive contained, among other

8  things, images and videos of your sexual abuse of Doe 1, and

9  law enforcement recovered chat conversations where you spoke

10  about sexually abusing Does 1 and 2, drugging them with Ambien

11  so they would stay asleep.  In total, you produced and saved

12  500 images and videos of Does 1 and 2.  You admitted that you

13  had distributed approximately twelve sexual abuse images of

14  Doe 1, and an additional twelve of Doe 2.

15          You admitted that you had produced child sexual

16  abuse images of two additional child victims during a sleepover

17  at your residence, people that had entrusted their children in

18  your house just so kids could have fun.  You distributed those

19  images after that abuse over a social media network and

20  platform.

21          You later admitted to capturing nude images of an

22  adult female friend of your ex-wife on multiple occasions and

23  filming another child through a bathroom window.  You had also

24  received a couple dozen child sexual abuse images of others.

25          Again, it's hard to overstate, in addition to

1   what's already been said in those victim impact statements and

2   what the United States has fairly said today, the serious and

3   egregious nature of this  crime.  There's just layer after

4   layer after layer of things that make this case particularly

5   disturbing, serious, dangerous.

6           Among them, to summarize--  Again, the advisory

7   guideline here typically would be life.  It's been reduced to

8   720 months, or 60 years, because there's two counts, each with

9   30-year maximums.  But make no mistake--  I know that you and

10  your attorney have asked for two 30-year sentences to run

11  concurrently, and I know the reasons for that, and I have

12  considered that.

13          But your conduct is so serious that Congress,

14  through a commission, under these circumstances, have said,

15  everything else being equal, life imprisonment.  Here, it's

16  reduced to 720 months.  Just advisory.  I could throw it out

17  the window if I wanted to after considering it.  So it's

18  advisory, but nevertheless, that speaks volumes to what a

19  serious crime we have before us.

20          And the reasons are legion.  This case involves

21  hands-on sexual abuse.  Possession of child pornography is

22  serious enough.  Distribution is serious enough.  But there's

23  hands-on sexual abuse of not one, not two--two minors, in

24  addition to capturing images of other people, in addition to

25  the hands-on sexual abuse of your--of two minors.  It wasn't

```
1    just any abuse of minors.  It was abuse of minor family
2    members, your own stepdaughters, a role that you took a sacred
3    oath to step into to fill a breach, and you leveraged that for
4    your own deviant and perverted pleasure and then shared it with
5    others.
6              In addition to the hands-on sexual abuse of the two
7    stepdaughters, the abuse persisted for years.  Even a minor,
8    drunken, moronic, and criminal single episode would be
9    incredibly serious, and you wake up the next day and go, what
10   in the world have I done.
11             That's not what happened here.  There was no
12   sobering up.  There was no, "This can't go on."  This abuse
13   persisted for years.  The trauma that was caused your victims,
14   it's going to persist for years, and it's immeasurable.  They
15   have a life sentence to deal with this.  The victim impact
16   statements that were read today weigh heavily here.  Those
17   victims have been heard, and I will take those into account.
18             In addition to the hands-on sexual abuse of your
19   stepdaughters for years, for years, that wasn't enough.  You
20   captured this abuse with digital images and videos, compounding
21   the trauma.  This isn't something that they had to suffer once,
22   knowing that.  That was harmful enough.  But now they know that
23   it was captured to be viewed later for someone else's
24   enjoyment, your own.
25             But in addition to that, you then distributed those
```

1    images and videos of your own stepdaughters to others on the

2    internet to share that abuse so other people could get their

3    enjoyment from it, again, again, just multiplying the damage

4    done to your own family.

5         You were involved with an online community of other

6    child predators or peddlers of child sexual abuse images.  And

7    that is a significant and serious aggravating factor here, and

8    it just shows how deep your perversion and compulsion goes.

9         In addition to everything I've mentioned, you

10   drugged your victims, so--  You can shake your head if you'd

11   like.  It's not in dispute that you gave your daughters Ambien;

12   that that, of course, made them sleep.  You talked in the PSR--

13   Ms. Woolam, please correct me if I'm wrong--but in a chat,

14   "Hey, one's not doing it."  "Well, then, try two."

15        Is that right, Ms. Woolam?  I just want to make

16   sure I'm not overstating anything, because I don't need to.

17   There's plenty enough here.  But give me one second.

18        MS. WOOLAM:  Yes, Your Honor.  It's paragraph 26 of

19   the PSR.  There's a message Kerby sent that said, "I tried

20   again with one, and it just doesn't knock her out."  There are

21   other messages that I mentioned earlier discussing the Ambien

22   and his discussions with individuals.

23        THE COURT:  Okay.  Thank you.

24        So you are giving them strong sleep aids so you can

25   have your way with them.  The complete disregard for the

1    innocence of your own family members is just hard to fathom,
2    but you did it.
3              You produced child sexual abuse material of two
4    additional child victims, and you distributed those materials
5    to other people.  So it didn't just stop with your own
6    stepdaughters.  You did all this in part, also, by hiding
7    cameras throughout your own house, capturing nude images of an
8    adult female who visited your home.
9              Combined, all of these considerations leave me no
10   doubt that you are an incredible danger to society.  You
11   appeared to just use everything and everyone around you for
12   your own perverted deviant pleasures, without regard to their
13   well-being, without regard to the consequences, and without
14   sympathy to the impact that it might have on them.
15             I have not seen--I have not seen a case like this
16   before, and I've seen a lot.  I often say that every time I
17   think I've seen truly the bottom of human depravity, a case
18   comes along and sadly proves me right, that I haven't found the
19   bottom, and this is one of those cases.  So, again, the nature
20   and circumstances here are unlike anything I've seen, and I
21   can't overstate how serious they are.
22             Now, it's not the only thing I consider.  I also
23   consider your history and your characteristics.  And I note
24   that you have no criminal history, and that weighs in your
25   favor.  I have taken that into account.  It does not materially

1    mitigate or offset the nature and circumstances of what you

2    did, because it's just so serious.

3         I've considered the need to impose a sentence that

4    reflects the seriousness of the offense.  I have to promote

5    respect for the law.  You absolutely knew better.  Time and

6    time and time and time and time again, you did what you wanted

7    to do, and then you shared it with others.

8         I have to give a just punishment.  And if anybody

9    ever questions whether just punishment is a proper sentencing

10   consideration, I'll note that this courtroom is full.  And it's

11   full of some of your supporters, but it's also full of some

12   community members who are ready to see just deserts be applied,

13   and that's something that Congress has told me to consider, and

14   I will.

15        I have to afford adequate deterrence of criminal

16   conduct, and I have to protect the public from further crimes.

17        I have considered whether any unwarranted

18   sentencing disparity would result if I were to apply a

19   guideline sentence.  And, Mr. Mayo, I have considered *Randall*,

20   and I have considered *Grzywinski*.  Thank you for that briefing.

21   That is helpful for me to think about this case in relation of

22   others.  Those cases--you know, many of those cases are--

23   they're just unique, and those cases are distinguishable.  Of

24   course, there are aspects of those cases that aren't present

25   here that are aggravating, but there are things present here

1     that are aggravating that aren't present in those cases.

2          So, in *Randall*, for example, while this is Kerby's

3     first conviction, Kerby is a hands-on offender of his own

4     stepchildren.  The victims here trusted him.  He was not some

5     online stranger.  And, moreover, he repeatedly just manipulated

6     the environment around them to increase his ability to do what

7     he wanted with them.

8          As for *Grzywinski*, while that defendant's past

9     hands-on offense certainly weighed heavily, it wasn't part of

10    the direct offense at issue.  The sentence was a substantial

11    upward variance in that case of about 20 years from the

12    guideline range, which was already raised in that case because

13    of the statutory minimum.  Here, the guidelines range would be

14    life, if not for the statutory maximum.

15          Moreover, we have actual production of child

16    pornography in this case, not just an attempt, along with

17    Kerby's actual distribution of the images to others, which,

18    again, just compounds the trauma and the victimization.

19          And then finally, again, these were his own

20    stepdaughters to whom he was entrusted, not strangers.

21          So I find that there is no unwarranted disparity as

22    a result of the advisory guideline range.  It's just advisory.

23    I'm going to impose a sentence that I think is the reasonable

24    one regardless.

25          After considering all of the statutory factors, the

1    purposes of sentencing, and the parties' arguments, I'm going

2    to deny the request for a concurrent sentence for the reasons

3    stated today by the Court and for the reasons stated by the

4    United States today in the court and in its sentencing

5    memorandum.

6            And for all of those reasons, the statutory

7    factors, the purposes of sentencing, the parties' arguments,

8    and all of the filings in this case, I have determined that a

9    sentence of 360 months as to Count 5, and 360 months as to

10   Count 6, to run consecutively, for a total of 720 months, is

11   sufficient, but not greater than necessary.

12           Given your age, sir, which is forty-five, I view

13   this as effectively a life sentence, but the judgment is

14   720 months.

15           I conclude that these sentences should run

16   consecutively in light of the egregious offense conduct, the

17   need for a just punishment and adequate deterrence, and the

18   need to protect the public from future crimes.

19           This offense involved extensive exploitation of the

20   defendant's stepchildren, stepchildren's friends, and even

21   other community members.  The defendant's actions have

22   inflicted life-long harms on his victims, and a combined

23   30-year sentence would be wholly inadequate to provide a just

24   punishment for these actions and to protect the public from his

25   demonstrated repeated predation on children.

 1          Accordingly, to properly account for all of the

 2    3553(a) factors, I do find it necessary to impose the statutory

 3    maximum as to each count and to run them consecutively.

 4          I will inform both sides that, although I believe

 5    the guideline calculations announced today were correct, to the

 6    extent they were incorrectly calculated, I would have imposed

 7    the same sentence without regard to that range, and I would

 8    have done so for the same reasons, in light of the 3553(a)

 9    factors.

10          This is one of those cases where, as I have

11    detailed, the nature and circumstances are just so egregious

12    that the only reasonable sentence, in this Court's view, is the

13    statutory maximum to both counts, regardless of the range, and

14    to run those consecutively, and I would do that regardless of

15    the range.

16          Upon release, if you are released, you will be on

17    supervised release for a term of life as to each count, to run

18    concurrently.  While on release, you shall comply with the

19    mandatory conditions of release listed in your presentence

20    report and in Section 3583(d).

21          Mr. Mayo, did you and your client receive and

22    discuss my written notice of intent to impose the standard and

23    special conditions?

24          MR. MAYO:  Yes, Your Honor.  We executed it and

25    filed it into the Court's file, as well as he--I gave him a

1    copy as well.

2              THE COURT:  All right.  Thank you very much.  I

3    appreciate that.  Do you have any objections to those

4    conditions?

5              MR. MAYO:  No, Your Honor.

6              THE COURT:  All right.  I have one minor change.

7    There was just a--either a typographical error on our part or a

8    misreporting of an address.  But the special condition

9    involving restitution and the detailing of the various victims,

10   the address listed various amounts for Doe 1.  The first "9"

11   that is listed in that address should be an "8."  I'm just

12   going to make that change.  I won't announce the entirety of

13   the address, but the first "9" for the address for Does 1 and 2

14   will be changed from a "9" to an "8."

15             Any objection to that?

16             MR. MAYO:  No objection.

17             THE COURT:  From the United States?

18             MS. WOOLAM:  No objection, Your Honor.

19             THE COURT:  Okay.  All right.  Hearing no

20   objections from either side to any of the conditions or the one

21   minor change today, the Court adopts those conditions today.

22   They will be included in their judgment--in my judgment.  I

23   find that all of those conditions are related to the nature and

24   characteristics of the offense, the history and characteristics

25   of the defendant, the deterrence of criminal conduct,

1  protection of the public from further crimes, and the provision

2  of needed correctional treatment.

3          Further, I find that these conditions do not impose

4  any greater deprivation of liberty than reasonably necessary to

5  advance deterrence, protect the public, and advance the

6  defendant's correctional needs.

7          I find that the defendant does not have the ability

8  to pay a fine in addition to the restitution obligations and

9  the assessments, so I'm going to waive a fine.

10         He must, however, pay the mandatory special

11 assessment of $200, 100 per count.  That's due and payable

12 immediately to the United States.

13         The defendant is subject to the Amy, Vicky, and

14 Andy Child Pornography Victim Assistance Act of 2018.  Based on

15 the defendant's financial condition and future earning capacity

16 and pursuant to 18 U.S.C. Section 2259, the defendant shall

17 immediately pay an assessment of $10,000--5,000 per count--

18 payable to the District Clerk's Office here in Abilene.

19         If, upon the commencement of the term of supervised

20 release, any part of that remains unpaid, he shall make

21 payments on the unpaid balance beginning 60 days after release

22 from custody at a rate of at least $200 per month until paid in

23 full.

24         The defendant is also subject to the Justice for

25 Victims of Trafficking Act.  Based on his ability to pay and

1   the future earning capacity and his financial condition and

2   pursuant to 18 U.S.C. Section 3014, he shall immediately pay an

3   assessment of $10,000--5,000 per count--payable to the Clerk's

4   Office in Abilene.

5           If, upon the commencement of the term of supervised

6   release, any part remains unpaid, he shall make payments on the

7   unpaid balance beginning 60 days after release from custody at

8   a rate of $200 per month until paid in full.

9           Okay.  Let's talk about restitution.  Regarding

10  restitution, the Court must determine the full amount of the

11  victims' losses that were incurred or are reasonably projected

12  to be incurred by the victim as a result of the trafficking and

13  child pornography depicting the victim.  That's

14  18 U.S.C. Section 2259(b)(2).

15          After doing so, I must order restitution in an

16  amount that reflects the defendant's relative role in the

17  causal process that underlies the victim's losses, but which is

18  no less than $3,000.

19          Pursuant to Section 2259(c)(2), the full amount of

20  the victim's losses includes any costs incurred or that are

21  reasonably projected to be incurred in the future by the

22  victim, including medical services related to physical,

23  psychiatric, and psychological care; physical and occupational

24  therapy and rehab; necessary transportation; temporary housing

25  and child expenses; lost income; reasonable attorney's fees; as

1    well as other costs incurred and any other relevant losses

2    incurred by the victim.

3         The government bears the burden of demonstrating

4    the amount of loss sustained by the victim.  That's *Paroline*.

5    And the Court may consider reliable evidence, including the

6    PSR, its addenda, and information provided by the victim.

7    That's *Serrata*, S-e-r-r-a-t-a, a Fifth Circuit case from 2017.

8         Once sufficient reliable evidence establishes the

9    victim's losses, the defendant must provide rebuttal evidence,

10    not mere objections, to contest the amount.  That's both

11    *Serrata* and *Williams*, a Fifth Circuit case from 2021 and

12    Section 2259(b)(3).

13         To determine the extent to which the defendant

14    proximately caused losses to the victim, I consider several

15    rough guideposts pursuant to *Paroline*.  While there are seven

16    rough guideposts in *Paroline* at 460, I won't list them all or

17    name them all, but I have considered them.  They are in front

18    of me.  This is not a rigid formula, and I need not make

19    explicit findings concerning all of the factors.  That is

20    *Halverson*, H-a-l-v-e-r-s-o-n.

21         Here, there are multiple identified victims of

22    Kerby's offenses who have requested restitution.  First, Jane

23    Does 1 and 2 have requested restitution due to Kerby's sexual

24    abuse of them, which he recorded and distributed to others.

25         Second, Maria and Pia, P-i-a, victims of known

```
 1    series of child pornography, have requested restitution based
 2    on the defendant's possession of their images.
 3              The Court has reviewed the evidentiary packets
 4    submitted by the victims and the parties' filings.  Those are
 5    Docket Numbers 44-1, 45, 47, 48, 50-2, 50-3, and 53-1.
 6              Now, I understand that the parties have come to an
 7    agreement on the total amount of restitution, and it's my
 8    understanding that that total amount is $540,042.08.
 9              Is that right, Ms. Woolam?  Is that the amount you
10    have?
11              MS. WOOLAM:  That is correct, Your Honor.
12              THE COURT:  Is that right, Mr. Mayo?
13              MR. MAYO:  Yes, Your Honor.
14              THE COURT:  Okay.  That is the amount ordered that
15    the defendant must pay in restitution.  Restitution shall be
16    paid to the District Clerk's Office in Abilene, Texas, for
17    disbursement in the following ways and to the following
18    victims:
19              $251,708.48 to Jane Doe 1, to Justin Cheyne in
20    trust for Jane Doe 1, in Tuscola, Texas;
21              $250,987.06 to Jane Doe 2, paid to the Clerk's
22    Office for Justin Cheyne--it's C-h-e-y-n-e--in trust for Doe 2,
23    in Tuscola, Texas;
24              $22,346.54 to Jane Does 1 and 2 jointly, paid to
25    the Clerk's Office for Justin Cheyne in trust for Does 1 and 2,
```

1    in Tuscola, Texas;

2              $7500 to Maria, paid to the Clerk's Office for

3    Carol Hepburn in trust for Maria; and

4              $7500 to Pia, to Deborah Biano in trust--

5    B-i-a-n-o--in trust for Pia, in Bellevue, Washington.

6              Based upon the documentation provided to the Court,

7    the Court has conducted the analysis required by *Paroline*, and

8    I do find that the restitution amounts that were awarded are

9    costs incurred or costs reasonably projected to be incurred in

10   the future by the victims as a proximate result of the

11   defendant's offense.

12             For Does 1 and 2, Kerby sexually abused these

13   victims, filmed their abuse, distributed the images and videos

14   to an unknown number of individuals online.  Given that these

15   images and videos are the direct result of Kerby's own offense

16   conduct, their losses are directly and proximately caused by

17   him.  The restitution amounts address conservative estimates of

18   the psychological counseling and medical treatment that Does 1

19   and 2 will need as a result of Kerby's actions, as detailed in

20   Docket Numbers 44-1, 47, 53-1, Government's Sealed Exhibit A to

21   Docket Number 47.

22             As explained in these documents, an hour of

23   professional counseling generally costs $150 to $200.  Using

24   the median rate at one session per week for 35 years, taking

25   the Jane Does to ages forty and thirty-seven, their counseling

1    costs will be around $245,000, not taking into account

2    inflation, medications prescribed, or the need for more

3    intensive counseling.

4            It is reasonably likely that they will end up

5    needing more than this median cost, making the awards of

6    250,000 to both Does appropriate future projections for

7    counseling expenses.  The additional $1,708.48 to Doe 1 and

8    $987.06 to Doe 2 reflect already-incurred medical expenses

9    detailed in their restitution filings.

10            Moreover, the additional $22,346.54 to Does 1 and 2

11    jointly addresses expenses incurred for transportation and

12    housing for the Does after the FBI raid on their previous

13    residence when they were residing with Kerby.  These costs are

14    outlined in Docket Numbers 44-1 and 53-1, and the Court finds

15    that they are reasonable costs incurred as a direct and

16    proximate result of Kerby's offense for the reasons stated in

17    Docket Number 47.

18            I further note that these awards to Does 1 and 2

19    were addressed in briefing by both the defendant and the

20    government, and the parties agree that these amounts were costs

21    incurred or costs reasonably projected to be incurred in the

22    future as the proximate result of the defendant's offense.  See

23    Docket Numbers 45, 47, and 48.

24            As for Kerby's collection of child pornography with

25    the victims Maria and Pia, I do find that, specifically, Kerby

1   had three files depicting Maria.  She has provided

2   documentation of an estimated lifetime cost between 124,000 and

3   change and 149,000 and change, excluding attorney's fees,

4   resulting from the production and distribution of images of

5   her.  187 prior restitution orders have been made for Maria,

6   but only 82 defendants have actually made any payments.

7            While Kerby did not produce these images, his

8   possession of them contributes to her continued

9   revictimization.  Accordingly, based on the documentation

10  provided and the *Paroline* analysis the Court has done, I do

11  conclude that $7500 represents costs incurred or reasonably

12  projected to be incurred in the future by Maria as a proximate

13  result of the defendant's offense.  This amounts to only

14  6 percent of the lower end of Maria's estimated losses.

15           As for Pia, Kerby possessed seven files depicting

16  Pia.  Pia has provided documentation estimating that she will

17  incur 286,000 to 323,000 for psychological care, and she

18  anticipates losing between 800,000 and 1.4 million in

19  employability as a result of the production and distribution of

20  the child pornography images of her.  It's unknown how many

21  persons possessed her images or how many restitution awards

22  have been made.  Again, he didn't produce--the defendant didn't

23  produce these images, but his possession of them aggravates the

24  trauma she faces due to these images of her at ages of three to

25  six years old.

```
1              Kerby's actions, like others who possessed these

2     images, effectively reinflicts the harm perpetrated against the

3     victim.  So, based on the documentation provided and my

4     consideration of the *Paroline* factors, I do conclude that $7500

5     represents the costs incurred or reasonably projected to be

6     incurred in the future by Pia as a proximate result of the

7     defendant's offense.  This amounts to 2.5 percent of the low

8     end of her estimated costs of psychological care.

9              Mr. Mayo, does the defendant believe that any

10    additional findings or explanation of the Court's conclusion is

11    required to sustain an award of restitution in an amount of

12    $540,042.08 to these victims?

13              MR. MAYO:  No, Your Honor.

14              THE COURT:  Does the government?

15              MS. WOOLAM:  No, Your Honor.

16              THE COURT:  Then that will be the order.

17              If, upon the commencement of the term of supervised

18    release, any part of this restitution remains unpaid, the

19    defendant shall make payments on the unpaid balance beginning

20    60 days after release from custody at a rate of at least $500

21    per month until paid in full.

22              It's ordered that your interest in the following

23    property is condemned and forfeited to the United States:

24              A black Seagate 2 terabyte external hard drive with

25    a serial number that ends in OTM and all other items listed in
```

1    Exhibit A by law enforcement during the search of the

2    defendant's residence on August 28th and turned over to law

3    enforcement on September 5th of 2023 and September 11th of

4    2023.

5              Mr. Mayo, I'm happy to pronounce all of the

6    property listed in Exhibit A here today, unless the defense and

7    the United States wish to waive that pronouncement.  Mr. Mayo,

8    can you confirm whether you would like the Court to pronounce

9    all of the property listed in Exhibit A?

10             MR. MAYO:  Yes, Your Honor, that is appropriate.

11   There's--and I'll get with the government as far as some other

12   additional family photos and things of that nature that weren't

13   included in Exhibit A that I know Mr. Kerby had an interest in

14   preserving for his family, but I'll get with the government on

15   that.

16             THE COURT:  Okay.  So let me make sure I

17   understand.  It's appropriate for you to waive the reading of

18   Exhibit A?

19             MR. MAYO:  That is correct, Judge.

20             THE COURT:  Okay.  Ms. Woolam, do I need to read

21   Exhibit A into the record, or will the government waive it, as

22   well?

23             MS. WOOLAM:  The government waives that reading, as

24   well, Your Honor.

25             THE COURT:  Okay.  All right.  And, Ms. Woolam,

1    just for the record, will you, well, confirm with me, Exhibit A

2    is found in--I have it in Docket Number 29 at pages 3 to 6, so

3    the record is clear on that.  You can confirm that and correct

4    me if I'm wrong.  But just so everyone is clear, that is

5    Exhibit A.  That is what--that is the material that I am

6    forfeiting.

7              All right.  I will recommend to the Bureau of

8    Prisons that, while incarcerated, the defendant receive

9    appropriate sex offender, substance abuse, and mental health

10   treatment, but I didn't lengthen the defendant's term of

11   imprisonment to promote rehabilitation.

12             All right.  Mr. Kerby, to the extent you have not

13   waived your right to appeal, you do have the right to appeal

14   your conviction and your sentence.  If you'd like to appeal,

15   you need to file a notice of appeal within 14 days of today in

16   this Court.  If you want to do that, just tell Mr. Mayo.  He's

17   very familiar with that process, and he can help you get that

18   done.

19             He can also ask that the costs associated with that

20   appeal go to the United States, and not to you.

21             Do you understand those appellate rights?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  Okay.  All right.  Mr. Mayo, anything

24   else from the defense?

25             MR. MAYO:  Judge, I would just ask for a nonbinding

```
 1    recommendation to Seagoville.

 2              THE COURT:  That's granted.  I'll make a nonbinding

 3    placement recommendation to FCI Seagoville.

 4              MR. MAYO:  Thank you, Judge.

 5              THE COURT:  All right.  And, Mr. Mayo, you were

 6    appointed by the Court to represent Mr. Kerby in this case; is

 7    that right?

 8              MR. MAYO:  Yes, Your Honor.

 9              THE COURT:  I want to thank you for accepting that

10    appointment.  Not all appointments are created equally.  This

11    required an extensive amount of work on your part and

12    collaboration with the United States.  You have done an

13    excellent job for your client.  The Court couldn't do its work

14    without members of the bar being willing to take criminal

15    appointments.  So on behalf of the Court of the Northern

16    District, thank you for your service to the Court.

17              Anything else from the United States?

18              MS. WOOLAM:  No, Your Honor.

19              THE COURT:  All right.  One second.

20         (PAUSE)

21              THE COURT:  All right.  Mr. Kerby, at this time,

22    you are remanded to the custody of the United States Marshal.

23              Court is adjourned.

24         (END OF HEARING)

25
```

1       I, Mechelle Daniel, Federal Official Court Reporter in and
for the United States District Court for the Northern District
2   of Texas, do hereby certify pursuant to Section 753,
Title 28, United States Code, that the foregoing is a true and
3   correct transcript of the stenographically reported proceedings
held in the above-entitled matter and that the transcript page
4   format is in conformance with the regulations of the Judicial
Conference of the United States.

5

6    /s/ Mechelle Daniel         **DATE**  JULY 8, 2024

7   MECHELLE DANIEL, CSR #3549
FEDERAL OFFICIAL COURT REPORTER

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25